

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-29-1999

# Steamfitters Loc 420 v. Philip Morris Inc

Precedential or Non-Precedential:

Docket 98-1426

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Steamfitters Loc 420 v. Philip Morris Inc" (1999). *1999 Decisions.* Paper 82.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/82

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 29, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-1426

STEAMFITTERS LOCAL UNION NO. 420 WELFARE FUND;
INTERNATIONAL BROTHERHOOD OF PAINTERS AND
ALLIED TRADES, DISTRICT COUNCIL NO. 21 WELFARE
FUND; INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, LOCAL UNION NO. 98, HEALTH
& WELFARE FUND; COMPOSITION ROOFERS UNION
LOCAL 30 COMBINED HEALTH & WELFARE FUND;
LABORERS' DISTRICT COUNCIL BUILDING AND
CONSTRUCTION HEALTH AND WELFARE FUND;
CARPENTERS HEALTH & WELFARE FUND OF
PHILADELPHIA AND VICINITY; CEMENT MASON'S UNION
LOCAL NO. 592, on behalf of themselves and all others
similarly situated,

      APPELLANTS

v.

PHILIP MORRIS, INC.; R.J. REYNOLDS TOBACCO
COMPANY; BROWN & WILLIAMSON TOBACCO
CORPORATION; B.A.T. INDUSTRIES P.L.C.; LORILLARD
TOBACCO COMPANY, INC.; LIGGETT & MYERS INC.;
THE AMERICAN TOBACCO COMPANY; UNITED STATES
TOBACCO COMPANY; THE COUNCIL FOR TOBACCO
RESEARCH--U.S.A., INC.; THE TOBACCO INSTITUTE,
INC.; SMOKELESS TOBACCO COUNCIL, INC.;
HILL & KNOWLTON, INC.

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 97-cv-05344)
District Judge: Honorable John P. Fullam

Argued: January 28, 1999

Before: BECKER, Chief Judge, SCIRICA and ROSENN,
Circuit Judges.

(Filed March 29, 1999)

        MELVYN I. WEISS, ESQUIRE
        MICHAEL C. SPENCER, ESQUIRE
          (ARGUED)
        KENNETH J. VIANALE, ESQUIRE
        BETH A. KASWAN, ESQUIRE
        JOAN T. BROWN, ESQUIRE
        Milberg, Weiss, Bershad, Hynes &
          Lerach, LLP
        One Pennsylvania Plaza
        New York, NY 10119

        RICHARD B. SIGMOND, ESQUIRE
        THOMAS H. KOHN, ESQUIRE
        Sagot, Jennings & Sigmond, P.C.
        The Penn Mutual Towers
        510 Walnut Street, 16th Floor
        Philadelphia, PA 19106

        ROBERT J. CONNERTON, ESQUIRE
        JAMES R. RAY, ESQUIRE
        JOHN McN. BROADDUS, ESQUIRE
        Connerton & Ray
        1401 New York Avenue, N.W.,
          10th Floor
        Washington, DC 20005

        PERRY WEITZ, ESQUIRE
        ROBERT L. GORDON, ESQUIRE
        JERRY KRISTAL, ESQUIRE
        MITCHELL BREIT, ESQUIRE
        KAREN J. SABINE, ESQUIRE
        Weitz & Luxenberg, P.C.
        51 Haddonfield Road, Suite 160
        Cherry Hill, NJ 08002

Of Counsel:
PROFESSOR G. ROBERT BLAKEY
PROFESSOR EINER ELHAUGE

Counsel for Appellants

HERBERT WACHTELL, ESQUIRE
 (ARGUED)
STEVEN M. BARNA, ESQUIRE
PETER C. HEIN, ESQUIRE
STEPHEN R. BLACKLOCKS,
 ESQUIRE
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019

MARY A. McLAUGHLIN, ESQUIRE
DAVID M. HOWARD, ESQUIRE
ALINE J. FAIRWEATHER, ESQUIRE
ANDREW S. MILLER, ESQUIRE
KATHY E. OCHROCH, ESQUIRE
Dechert, Price & Rhoads
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA 19103-2793

DAVID S. EGGERT, ESQUIRE
JAMES ROSENTHAL
Arnold & Porter
555 12th Street, N.W.
Washington, DC 20004

Counsel for Appellee Philip Morris
Incorporated

ROBERT H. KLONOFF, ESQUIRE
PAUL S. RYERSON, ESQUIRE
PAUL REICHERT, ESQUIRE
Jones, Day, Reavis & Pogue
Metropolitan Square
1450 G Street, N.W.
Washington, DC 20005

3

JOHN D. GOETZ, ESQUIRE
MAUREEN T. TAYLOR, ESQUIRE
Jones, Day, Reavis & Pogue
1 Mellon Bank Center,
 31st Floor
500 Grant Street
Pittsburgh, PA 15219

Counsel for Appellee R.J. Reynolds
Tobacco Company

EDWARD W. WARREN, ESQUIRE
KENNETH N. BASS, ESQUIRE
Kirkland & Ellis
655 15th Street, N.W., Suite 1200
Washington, DC 20005

Counsel for Appellee Brown &
Williamson Tobacco Corporation
(including as successor by merger to
The American Tobacco Company)

WILLIAM J. O'BRIEN, ESQUIRE
HOWARD M. KLEIN, ESQUIRE
Conrad, O'Brien, Gellman &
 Rohn, P.C.
1515 Market Street, 16th Floor
Philadelphia, PA 19102-1916

JEFFREY S. NELSON, ESQUIRE
JOSEPH A. LANAHAN, ESQUIRE
Shook, Hardy, & Bacon, LLP
One Kansas City Place
1200 Main Street
Kansas City, MO 64105

Counsel for Appellee Lorillard
Tobacco Company

J. KURT STRAUB, ESQUIRE
Obermayer, Rebman, Maxwell &
 Hippel, LLP
One Penn Center, 19th Floor
1617 John F. Kennedy Blvd.
Philadelphia, PA 19103-1895

Counsel for Appellee Liggett & Myers,
Inc.

STEPHEN J. IMBRIGLIA, ESQUIRE
Hecker, Brown, Sherry & Johnson
18th & Arch Streets
1700 Two Logan Square
Philadelphia, PA 19103

Counsel for Appellee United States
Tobacco Company

PATRICK W. KITTREDGE, ESQUIRE
GLENN E. DAVIS, ESQUIRE
Kittredge, Donley, Elson, Fullem &
 Embick, LLP
421 Chestnut Street, 5th Floor
Philadelphia, PA 19106

STEVEN KLUGMAN, ESQUIRE
R. TOWNSEND DAVIS, JR.
Debevoise & Plimpton
875 Third Avenue
New York, NY 10022

Counsel for Appellee The Council for
Tobacco Research-USA, Inc.

WILLIAM J. O'BRIEN, ESQUIRE
HOWARD M. KLEIN, ESQUIRE
Conrad, O'Brien, Gellman &
 Rohn, P.C.
1515 Market Street, 16th Floor
Philadelphia, PA 19102-1916

Counsel for Appellee The Tobacco
Institute

5

WILBUR L. KIPNES, ESQUIRE
Schnader, Harrison, Segal &
 Lewis, LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103

Counsel for Appellee Smokeless
Tobacco Council, Inc.

RICHARD L. KREMNICK, ESQUIRE
Blank, Rome, Comisky &
 McCauley, LLP
One Logan Square, 10th Floor
Philadelphia, PA 19103-6998

BRUCE M. GINSBERG, ESQUIRE
MARC RACHMAN, ESQUIRE
Davis & Gilbert
1740 Broadway
New York, NY 10019

Counsel for Appellee Hill &
Knowlton, Inc.

STEPHANIE W. KANWIT, ESQUIRE
Groom Law Group Chartered
1701 Pennsylvania Avenue, N.W.
Washington, DC 20006

DAVID ALLEN, ESQUIRE
CORINA TRAINER, ESQUIRE
UMWA Health & Retirement Fund
4455 Connecticut Avenue, N.W.
Washington, DC 20008

DANIEL B. EDELMAN, ESQUIRE
Yablonski, Both & Edelman
1140 Connecticut Avenue, N.W.
Washington, DC 20036

Counsel for Amicus Curiae United
Mine Workers of America Combined
Benefit Fund

KENNETH S. GELLER, ESQUIRE
JOHN J. SULLIVAN, ESQUIRE
Mayer, Brown & Platt
2000 Pennsylvania Avenue, N.W.
Washington, DC 20006

STEPHEN A. BOKAT, ESQUIRE
ROBIN S. CONRAD, ESQUIRE
National Chamber Litigation
 Center, Inc.
1615 H Street, N.W.
Washington, DC 20062

Counsel for Amicus Curiae Chamber
of Commerce of the United States

CARL R. SCHENKER, JR., ESQUIRE
JOHN H. BEISNER, ESQUIRE
TERESA SWONG, ESQUIRE
O'Melveny & Myers, LLP
555 13th Street, N.W.
Suite 1500 West
Washington, DC 20004

HUGH F. YOUNG, JR., ESQUIRE
Produce Liability Advisory
 Council, Inc.
1850 Centennial Park Drive,
 Suite 510
Reston, VA 22091

Counsel for Amicus Curiae Product
Liability Advisory Council, Inc.

JAN S. AMUNDSON, ESQUIRE
General Counsel
National Association of
 Manufacturers
1331 Pennsylvania Avenue, N.W.
Suite 1500 – North Lobby
Washington, DC 20004-1790

Counsel for Amicus Curiae National
Association of Manufacturers

OPINION OF THE COURT

BECKER, Chief Judge.

This is one of a vast number of cases filed in state and federal courts all over the nation seeking to hold tobacco companies liable for the smoking-related costs incurred by union health and welfare funds. The plaintiff funds allege that they were defrauded by the defendants--tobacco companies and related industry organizations--into paying for their participants' smoking-related illnesses, as well as prevented by these defendants from informing the funds' participants about safer smoking and smoking-cessation products. The defendants allegedly conspired to prevent the funds from obtaining and using information that would have reduced the incidence of smoking--and therefore of illness--among the funds' participants. The fraud and conspiracy charges are the underpinnings of plaintiffs' federal statutory claims, which are brought under the antitrust laws and the civil RICO statute. Plaintiffs also assert state common-law claims based on supplemental jurisdiction.

The District Court dismissed plaintiffs' complaint under Federal Rule of Civil Procedure 12(b)(6), on the ground that the claimed injuries of the plaintiff funds were too remote from any wrongdoing of the defendants to be redressable under either federal or state law. The correctness of that conclusion is the primary issue on this appeal. Put another way, we are called upon to determine whether plaintiffs have alleged a compensable injury proximately caused by defendants' allegedly fraudulent and conspiratorial conduct sufficient to avoid dismissal under Rule 12(b)(6). This basic proximate cause inquiry, drawn from tort law, is complicated by the allegations of intentional tort, the packaging of plaintiffs' claims in RICO and antitrust terms, and the addition of state-law claims based on fraud, special duty, unjust enrichment, negligence, strict liability, and breach of warranty. In the end, we conclude that the District Court correctly dismissed all of plaintiffs' primary claims as being too remote from any alleged wrongdoing of

8

defendants, and the other claims as concomitantly lacking in merit; hence, we affirm the dismissal of the complaint in its entirety.

I. Background

A. Facts and Procedural History

This suit was brought by seven Pennsylvania-based union health and welfare funds (the "Funds") as a putative class action on behalf of all such similarly-situated funds against eight tobacco companies and certain industry organizations (collectively, the "tobacco companies")[1] to recover for the Funds' costs of treating their participants' smoking-related illnesses. The suit is patterned after similar suits brought by state attorneys general, which were recently settled with the tobacco companies for more than $200 billion.[2] See Barry Meier, Remaining States Approve the Pact on Tobacco Suits, N.Y. Times, Nov. 21, 1998, at A1.[3]

_____

1. The defendants include tobacco companies Philip Morris; R.J. Reynolds; Brown & Williamson; B.A.T. Industries; Lorillard; Liggett & Myers; the American Tobacco Company; and the United States Tobacco Company. In addition, named as defendants are the Council for Tobacco Research-USA; the Tobacco Institute; Smokeless Tobacco Council; and Hill & Knowlton, a public relations firm.

2. The parties cite a large number of reported state and federal opinions of this genre (of both the union fund and attorney general variety), and have also provided us with a considerable number of unreported decisions. For the benefit of students of this litigation war, we list these
decisions in an Appendix to this opinion. We note that in the vast majority of the union fund cases cited by the parties (15 of 20), at least some of the plaintiffs' claims were dismissed. In 11 of the 20 cases (including the present one), courts have dismissed the plaintiffs' entire case. In the only case to reach a jury, the tobacco companies recently prevailed in federal court in Ohio. See Barry Meier, Verdict Backs Cigarette Makers in Suit by Union Health Funds, N.Y. Times, Mar. 19, 1999, at A10.

3. Although the tobacco companies and state attorneys general have reached an agreement resolving the state suits, the litigation surrounding these cases is apparently far from over. See, e.g., Ann Belser & Mark Belko, County Files Suit Against Tobacco, Pitt. Post-

In the present case, the Funds have brought federal claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. S 1962, and the antitrust laws, 15 U.S.C. S 1. Their complaint also includes, under the supplemental jurisdiction statute, 28 U.S.C. S 1367, state-law claims for misrepresentation, breach of special duty, unjust enrichment, negligence, strict liability, and breach of warranty. The Funds seek both damages and extensive injunctive relief requiring the defendants to disclose any research on smoking that they have concealed, engage in a public education campaign to reduce smoking, cease advertising their products to minors, and fund smoking-cessation programs.

The Funds allege, inter alia, that the tobacco companies conspired to suppress research on safer tobacco products, defrauded health care providers and payers by informing them that the companies' tobacco products were safe, and caused smokers to become ill by preventing the dissemination of smoking-reduction and smoking-cessation information. All of these actions allegedly caused the costs of smoking-related illnesses to be shifted from their proper source, the tobacco companies, to the plaintiff Funds (and others). This shift in costs purportedly was accomplished through the intentional and fraudulent actions of the tobacco companies, directed at both smokers and the Funds themselves.

Seeking to recover for these costs, the Funds filed suit in the District Court for the Eastern District of Pennsylvania in August 1997. Shortly thereafter, the defendants moved to dismiss the complaint under Federal Rule of Civil

_____

Gazette, Mar. 6, 1999, at A1 (noting that Allegheny County, Pennsylvania, had filed suit against the tobacco companies in federal court at the same time it was seeking in state court to block final approval of the settlement by the attorneys general). In addition, the federal government appears poised to act. See  White House Office of Communications, FY2000 Budget Summary and Supporting Materials (Feb. 1, 1999), available in 1999 WL 42060, at *46 ("To recover these losses [from tobacco-related health problems], the U.S. Department of Justice intends to bring suit against the tobacco industry, and the budget provides $20 million to pay for necessary legal costs.").

10

Procedure 12(b)(6), and, in an order accompanied by an unpublished opinion, the District Court granted the motion. See Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., No. CIV.A.97-5344, 1998 WL 212846 (E.D. Pa. Apr. 22, 1998). The Court relied on two general grounds to dismiss the entire complaint, and invoked a number of additional rationales to reject the Funds' specific claims. First, it held that plaintiffs did not state a claim because of "the general rule [that] has long been established that one who pays the medical expenses of an injured party does not have a direct claim against the tortfeasor who caused the injury." Id. at *1. The District Court decided, however, that it "need not dwell upon this issue," as the Funds' claims "suffer from an even more fundamental flaw, namely, the fact that plaintiffs have not suffered any cognizable damages." Id. at *2. The District Court reasoned that the Funds' increased costs for smoking-related illnesses caused them no injury because "plaintiffs are merely handling the payments with money provided by others, and have no genuine stake in the matter," id., and "cannot claim to have suffered any economic loss in the form of lost profits," id. at *3.

The District Court also dismissed the complaint because (1) plaintiffs "allege no injury of the sort the antitrust laws were designed to prevent"; (2) the Funds' common-law fraud claims "are entirely too speculative to be taken seriously"; (3) plaintiffs "simply do not have legal standing to advance" claims for injunctive relief; (4) the state special-duty claim is "restricted to `physical harm' " that plaintiffs do not allege they suffered; and (5) the Funds' unjust enrichment claim "is simply a subrogation claim expressed in different language." Id. at *3-*4. Plaintiffs filed a timely notice of appeal. We have appellate jurisdiction under 28 U.S.C. S 1291. Our review of the District Court's order is plenary. See Gallo v. City of Philadelphia, 161 F.3d 217, 221 (3d Cir. 1998). We accept as true all factual allegations in the complaint and will affirm a dismissal under Rule 12(b)(6) only if "it is certain that no relief can be granted under any set of facts which could be proved." City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 262 n.12 (3d Cir. 1998) (internal quotations omitted).

11

B. The Allegations and Theory of the Complaint

Plaintiffs' complaint is voluminous (containing 317 paragraphs and running to 116 pages) and detailed in its explication of the history of the tobacco companies' alleged wrongdoing. By now, this history is well-known to the public at large, though plaintiffs rely heavily on the fact that the defendants successfully conspired to cover up their wrongdoing for almost five decades. This conspiracy was allegedly directed at both smokers and the plaintiff Funds themselves. Therefore, plaintiffs aver, they are both indirect and direct victims of the defendants' wrongful conduct.

1. The Indirect Injury

The Funds' indirect injury allegedly arises from the fact that they paid millions of dollars for the smoking-related medical expenses of Fund participants whom they say were victimized by the tobacco companies' conspiracy and fraud. The defendants respond that this indirect claim is simply a traditional subrogation claim dressed up in treble-damages federal statutory clothing. They invoke the general principle that an insurer's only claim against a tortfeasor for the insurer's costs arising out of wrongdoing against an insured is by way of subrogation. See, e.g., Great Am. Ins. Co. v. United States, 575 F.2d 1031, 1033 (2d Cir. 1978). Generally, if an insurer wishes to recover from the wrongdoer, it must assert the same claim—by way of subrogation—that the insured could have asserted against the wrongdoer, as well as be subject to the same defenses that the wrongdoer could assert in defense of the claim. The defendants argue that the Funds could seek to recover the costs of treating participants' smoking-related illnesses only through tort actions such as those that have been asserted individually by smokers. Cf. Cipollone v. Liggett Group, Inc., 505 U.S. 504 (1992).

2. The Direct Injury

In plaintiffs' submission, notwithstanding defendants' argument that all of the Funds' claims are essentially subrogation claims, their "direct" claim is a fundamentally different legal claim from the typical insurer-against-

12

wrongdoer claim that falls under the principle of subrogation. This direct claim is said to arise not only out of a tortfeasor's actions toward an insured, but also from its actions toward the insurance company (here the Funds) itself. The traditional subrogation principle holds that an " `insurer, upon paying to the assured the amount of a loss of the property insured, is doubtless subrogated in a corresponding amount to the assured's right of action against any other person responsible for the loss.' " Great Am. Ins. Co., 575 F.2d at 1034 (quoting W. Vance, Vance on Insurance 787 n.2 (3d ed. 1951)). Here, the Funds are essentially claiming that they paid for more than"the property insured" (i.e., the health of fund participants) because the defendants caused the Funds to expend additional costs that would have been paid by the tobacco companies (through reduced revenues and tort damages) if they had not defrauded the Funds and conspired to cover up their wrongdoing.

As the Funds frame their direct injury argument: "Had defendants not undertaken their deceptive, fraudulent, and anticompetitive activity, the Trusts' trustees, administrators, and advisors could have taken counter-measures against smoking and smoking-related illness and would have commenced legal efforts much sooner and more effectively to impose the costs resulting from tobacco use on the tobacco companies." Appellants' Br. at 10. Plaintiffs' complaint sets out this theory as follows:

> Defendants' contract, combination, or conspiracy was and is for the express purpose and effect of restraining, suppressing and withholding information necessary to medical care researchers, providers, and payers, including Plaintiffs and members of the Class, so that the costs of health care for tobacco-related illnesses continue to be borne by health care providers and payers, such as Plaintiffs and members of the Class, [who] are injured in their business and property by, among other things, having to provide or pay for the health care costs of persons with tobacco-related diseases without being reimbursed by Defendants.

Compl. P 256. Plaintiffs correctly observe that the District Court did not address this alleged "direct" injury, but as is

13

clear from our discussion below, we do not find the directness of the Funds' alleged injury dispositive of whether they have stated a claim under either federal or state law.

II. Plaintiffs' Federal Claims

A. Introduction

Plaintiffs' federal claims are based on the antitrust laws and the RICO statute. In brief, they allege that defendants conspired to withhold certain information and products from the Funds, and fraudulently induced the Funds to reimburse smokers for illnesses caused by the tobacco companies' wrongdoing. We need not focus on many of the necessary elements of these claims, such as the details of the conspiracy and the fraud, whether the Funds (or others) reasonably relied on the fraud, the predicate acts for the RICO claims, etc. Rather, we focus on the issue of proximate cause, a necessary element for bringing both antitrust and RICO claims, and an element we find lacking in plaintiffs' case.

Given the Supreme Court's determination that the standing requirements for RICO and antitrust claims are similar, and that the standing analysis under these federal laws is drawn from common-law principles of proximate cause and remoteness of injury, we analyze the key remoteness issue for plaintiffs' federal claims under the rubric of standing doctrine. See Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 268 (1992) (RICO); Blue Shield v. McCready, 457 U.S. 465, 477 (1982) (antitrust).

As is clear from our discussion below, the key problem with plaintiffs' complaint is the remoteness of their alleged injury from the defendants' alleged wrongdoing. Remoteness is an aspect of the proximate cause analysis, in that an injury that is too remote from its causal agent fails to satisfy tort law's proximate cause requirement--a requirement that the Supreme Court has adopted for federal antitrust and RICO claims. Cf. McCready, 457 U.S. at 477 ("In the absence of direct guidance from Congress,

14

and faced with the claim that a particular injury is too remote from the alleged violation to warrant [antitrust] standing, the courts are thus forced to resort to an analysis no less elusive than that employed traditionally by courts at common law with respect to the matter of `proximate cause.' "). By subsuming the proximate cause requirement under the concept of standing, the Supreme Court has acknowledged that a private plaintiff might validly plead (and even prove) that a defendant has committed an antitrust violation, but still lack standing to enjoin or remedy this violation if his own injury is too remotely connected to it. Therefore, in discussing whether plaintiffs have standing to bring their antitrust or RICO claims, we will focus on proximate cause in general and on remoteness in particular.

Plaintiffs' claims are largely grounded in allegations of fraud on the part of defendants. Therefore, we would normally focus initially, in addressing the federal claims in this case, on the RICO claims, which are predicated on alleged mail and wire fraud by the defendants. See Compl. P 224(a). However, the Supreme Court has discussed proximate cause more expansively in the antitrust context, and has incorporated this discussion into its RICO jurisprudence. See Holmes, 503 U.S. at 268-70. We therefore begin our discussion of plaintiffs' federal claims with an analysis of the Court's holdings in the antitrust field.[4]

_____

4. As noted above, the District Court also dismissed plaintiffs' complaint on the ground that the Funds have suffered no cognizable injury. See Steamfitters, 1998 WL 212846, at *2-*3 (finding that any increased expenses due to smoking-related illnesses of fund participants "merely meant that the unions negotiated a greater level of contributions from the employers"). We seriously doubt that this was an appropriate basis for dismissing the complaint. The plaintiffs clearly could not go at will to the employers who funded their health plans for a replenishment any time they needed more money. Increased costs likely necessitated reduced expenditures in other areas, as well as reductions in the Funds' reserves. Cf. Amicus Br. of UMWA Combined Benefit Fund at 22 (noting that the Funds cannot "merely return to the inexhaustible well of employers' bank accounts when the spigot for health benefits runs dry"). Simply because they are not the ultimate source of the money used to pay for smoking-related illnesses does not mean that the Funds have suffered no legally cognizable injury.

B. Antitrust Standing: Remoteness and Proximate Cause

In adopting a proximate cause requirement for antitrust claims, the Supreme Court has explained that, despite the broad language and remedial purpose of the antitrust laws, "[i]t is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property." McCready, 457 U.S. at 477. In discussing the requirements for proximate cause, the Court has repeatedly noted that "proximate cause is hardly a rigorous analytic tool." Id. at 477 n.13; see also Associated Gen. Contractors, Inc. v. California State Council of Carpenters, 459 U.S. 519, 536-37 & n.34 (1983); Merican, Inc. v. Caterpillar Tractor Co., 713 F.2d 958, 964 (3d Cir. 1983) ("Because of the infinite variety of claims that arise under the antitrust statutes, [the Supreme Court] has refused to fashion a black-letter rule for determining standing in every case."). Therefore, the Court has emphasized that lower courts should avoid applying bright-line rules and instead should analyze the circumstances of each case, focusing on certain key factors.

1. Blue Shield v. McCready

In McCready, the Court held that the primary factors for evaluating proximate cause in an antitrust action were: (1)
_____

The District Court also found that all of the Funds' claims are essentially subrogation claims and therefore could not be brought under the federal and state theories invoked in the complaint. See Steamfitters, 1998 WL 212846, at *1. Again, we do not necessarily agree with this conclusion. As noted supra Part I.B.2, the Funds' claims of direct injury are fundamentally different from a traditional insurer-against-wrongdoer subrogation claim. They are said to arise not only out of the wrongdoer's actions toward the insured, but also out of his actions directed at the insurer in attempting to avoid the consequences of his misdeeds.

We need not resolve these issues, however, for we conclude that the District Court correctly held that the Funds' alleged injuries are too remote from any wrongdoing by the defendants to be redressable through the RICO statute, the antitrust laws, or state common-law theories of recovery.

16

"the physical and economic nexus between the alleged [antitrust] violation and the harm to the plaintiff" and (2) "more particularly, . . . the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned in making defendant's conduct unlawful and in providing a private remedy" under the antitrust laws. McCready, 457 U.S. at 478. In discussing these factors (and finding that the plaintiff in McCready had standing to assert a claim under the antitrust laws), the Court noted:

> The availability of [an antitrust] remedy to some person who claims its benefit is not a question of the specific intent of the conspirators. Here the remedy cannot reasonably be restricted to those competitors whom the conspirators hoped to eliminate from the market. McCready claims that she has been the victim of a concerted refusal to pay on the part of Blue Shield, motivated by a desire to deprive psychologists of the patronage of Blue Shield subscribers. Denying reimbursement to subscribers for the cost of treatment was the very means by which it is alleged that Blue Shield sought to achieve its illegal ends. The harm to McCready and her class was clearly foreseeable; indeed, it was a necessary step in effecting the ends of the alleged illegal conspiracy. Where the injury alleged is so integral an aspect of the conspiracy alleged, there can be no question but that the loss was precisely the type of loss that the claimed violations . . . would be likely to cause.

Id. at 479 (emphases added) (omission in original) (internal quotations omitted). The Funds allege that the defendants' hiding of their knowledge of the dangers of smoking and conspiring to keep safer tobacco products from the market "was the very means by which [the tobacco companies] sought to achieve [their] illegal ends" and the Funds' payment of extra costs "was a necessary step in effecting the ends of the alleged illegal conspiracy." Therefore, they argue, their claims fit precisely within the rule of McCready.

We disagree. Unlike the defendants in McCready, the tobacco companies could have achieved their alleged aims without the existence of the Funds or the relationship

17

between the Funds and smokers. In McCready, psychiatrists allegedly conspired with Blue Cross to exclude psychologists from the psychotherapy market by persuading Blue Cross to reimburse subscribers for this service only when it was provided by a psychiatrist. The reimbursement scheme was both the alleged conspiracy and the cause of McCready's harm: McCready was a psychotherapy patient denied reimbursement for her treatment by a psychologist. If Blue Cross subscribers such as McCready did not exist, a conspiracy between psychiatrists and Blue Cross would never have come about (as it would have been ineffective to achieve the alleged aims of the conspiracy). Cf. Gregory Mktg. Corp. v. Wakefern Food Corp., 787 F.2d 92, 96-97 (3d Cir. 1986) (holding that plaintiff, a food broker for defendant manufacturer, had suffered no antitrust injury because it was not a consumer or competitor of defendant, and was not an "essential participant" in defendant's scheme to price-discriminate against certain retailers).

In contrast, the tobacco companies would have had ample reason to engage in a conspiracy to prevent safer tobacco products from coming on the market, regardless of the relationship between the Funds and smokers. The very existence of smokers would be a sufficient reason for such an alleged conspiracy. The fact that the Funds reimbursed smokers for their smoking-related illnesses might have made the conspiracy more profitable or allowed it to exist longer, but the relationship between the Funds and smokers was not "a necessary step in effecting the ends of the alleged illegal conspiracy."

It is for this reason that plaintiffs' reliance on Prudential Insurance Co. of America v. United States Gypsum Co., 828 F. Supp. 287 (D.N.J. 1993), is also misplaced. In that case, which also included allegations of fraudulent acts intended to mislead consumers about the safety of defendants' product (asbestos), the district court denied defendants' motion for summary judgment on plaintiffs' RICO claims. The court noted that "the fraud scheme directly targeted entities like Prudential, [a real estate dealer,] for the fraud would not have been worth it if large real estate dealers did not continue to buy such buildings." Id. at 297. In addition,

18

the plaintiffs "stood to keep the defendants' products valuable by continuing to buy buildings containing defendants' products." Id. In the present case, the tobacco companies' alleged fraud would still have been "worth it" if the Funds and other health care payers did not reimburse smokers for their illnesses.

In addition, the defendants' fraud in Prudential prevented the building purchasers from obtaining information about the dangers of asbestos--information that would have led them to not purchase buildings containing this product. In this case, however, even if the tobacco companies had not prevented health care payers from discovering the dangers of smoking, there is no claim that the Funds would have chosen to not insure smokers. The defendants' conspiracy in McCready and the defendants' fraud in Prudential would have been without purpose or effect if the plaintiffs in those cases did not use the services of the directly targeted parties, psychologists and building contractors, respectively. The same is not true in the present case.

2. Associated General Contractors

a. The Relevant Factors

Shortly after McCready was decided, the Supreme Court provided further guidance in this area in Associated General Contractors, Inc. v. California State Council of Carpenters, 459 U.S. 519 (1983) [AGC]. In AGC, a union sued a contractors' association on antitrust grounds, alleging a conspiracy to force builders and contractors to use primarily nonunionized subcontractors. The court of appeals had framed the union's argument for antitrust standing (which it had accepted) in much the same way that the Funds frame their argument here: "In support of the Union's standing, the [court of appeals] reasoned that the Union was within the area of the economy endangered by a breakdown of competitive conditions, not only because injury to the Union was a foreseeable consequence of the antitrust violation, but also because that injury was specifically intended by the defendants." Id. at 525.

19

After discussing at length proximate cause principles
likely incorporated by Congress into the Sherman Act in
1890, see id. at 530-34 & nn.20-25,5 the Supreme Court

_____

5. In addressing the key remoteness issue, the parties argue a good deal
about the meaning of footnote 25 in AGC, but we think they place too
much weight on the Court's citations therein to an 1882 treatise on
damages. The relevant paragraph of the footnote reads as follows:

> In torts, a leading treatise on damages set forth the general
> principle that, "[w]here the plaintiff sustains injury from the
> defendant's conduct to a third person, it is too remote, if the plaintiff
> sustains no other than a contract relation to such a third person, or
> is under contract obligation on his account, and the injury consists
> only in impairing the ability or inclination of such person to perform
> his part, or in increasing the plaintiff 's expense or labor of fulfilling
> such contract, unless the wrongful act is willful for that purpose."
> Thus, A, who had agreed with a town to support all the town
> paupers for a specific period, in return for afixed sum, had no
> cause of action against S for assaulting and beating one of the
> paupers, thereby putting A to increased expense. Similarly, a
> purchaser under an output contract with a manufacturer had no
> right of recovery against a trespasser who stopped the company's
> machinery, and a creditor could not recover against a person who
> had forged a note, causing diminution in the dividends from an
> estate. 1 J. Sutherland, Law of Damages 55-56 (1882) (emphasis in
> original, footnote omitted).

AGC, 459 U.S. at 532-33 n.25. Contrary to defendants' contention, the
Court appears to have quoted this excerpt from Sutherland as simply a
"general principle" and not as the outer limits of possible antitrust
liability. Further, while the first example cited appears to support the
tobacco companies' argument on remoteness, the allegations here are
more analogous to a situation in which A agreed to support all the town
paupers and S, after assaulting and beating a number of the paupers,
covered up his wrongdoing and affirmatively kept A from reducing its
costs of supporting the injured paupers. While we still question whether,
in Sutherland's view, A would have a cause of action against S under
this scenario, it is certainly a closer question than that raised by the
example in the excerpt.

On the other hand, plaintiffs place much weight on the qualifier at the
end of the internally quoted language, i.e., "unless the wrongful act is
willful for that purpose." Our view of the import of this qualifier,
however, is not the same as theirs, as we do not think a sentence

fragment in a single quotation in a Supreme Court footnote is sufficient

outlined a number of factors to consider in theflexible antitrust standing analysis: (1) the causal connection between defendant's wrongdoing and plaintiff's harm; (2) the specific intent of defendant to harm plaintiff; (3) the nature of plaintiff 's alleged injury (and whether it relates to the purpose of the antitrust laws, i.e., ensuring competition within economic markets); (4) "the directness or indirectness of the asserted injury"; (5) whether the "damages claim is . . . highly speculative"; and (6) "keeping the scope of complex antitrust trials within judicially manageable limits," i.e., "avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other." Id. at 537–38, 540, 542–44.6

b. Applying the AGC Factors

i. Causation and Intent

Although the first two factors—a causal connection and an intent to harm the plaintiff—were present in AGC, this was insufficient to give the plaintiff antitrust standing. See AGC, 459 U.S. at 537; see also Merican, 713 F.2d at 964 n.13 ("Claims that a defendant specifically intended to harm the plaintiff, however, are not of controlling significance. Although a defendant's improper motive may

_____

to override the clear text of that opinion—text that squarely holds that "an allegation of improper motive, although it may support a plaintiff 's damages claim under S 4, is not a panacea that will enable any complaint to withstand a motion to dismiss." Id. at 537 (footnote omitted).

6. We take these "factors" from AGC's lengthy discussion of antitrust standing. However, our prior cases have at times distilled Supreme Court precedent in this area into a more succinct test:"To establish antitrust standing a plaintiff must show both: 1) harm of the type the antitrust laws were intended to prevent; and 2) an injury to the plaintiff which flows from that which makes defendant's acts unlawful." Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp., 995 F.2d 425, 429 (3d Cir. 1993). In other cases, we have extracted five relevant factors from AGC. See, e.g., Conte Bros. Automotive, Inc. v. Quaker State-Slick 50, Inc., 165 F.3d 221, 233 (3d Cir. 1998); In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1165–66 (3d Cir. 1993).

21

sometimes support a damages claim under S 4[of the Clayton Act], it `is not a panacea that will enable any complaint to withstand a motion to dismiss.' " (quoting AGC, 459 U.S. at 537)). Plaintiffs urge us to focus on the causal connection (proximate or otherwise) between the tobacco companies' wrongdoing and the injury to the Funds, as well as the companies' alleged specific intent to foist the costs of their wrongdoing onto the Funds. As in AGC, we do not find these factors to be dispositive on the issue of antitrust standing. See also Gregory Mktg., 787 F.2d at 95 ("[N]either causation in this but-for sense nor an allegation of improper motive is sufficient to `enable any complaint to withstand a motion to dismiss.' " (quoting AGC, 459 U.S. at 537)).

What is more, for the reasons set forth in the margin, it is unclear whether there exists a causal connection (proximate or otherwise) between any antitrust wrongdoing on the part of the defendants and the Funds' alleged injuries of increased health care expenditures.7 An

_____

7. It is unclear from plaintiffs' complaint precisely what antitrust wrongdoing they allege is connected to their own injuries. See, e.g., Compl. P 242 (alleging defendants engaged in the "anti-competitive restriction of product choice and suppression of product information," thereby "restricting consumer choice, and causing consumers to suffer tobacco-related illnesses"); id. P 246 ("Defendants also conspired to eliminate competition among themselves in the research, development, production and marketing of alternative, higher quality, and safer cigarettes and tobacco products.").

A business's decision to not produce a product, simpliciter, is not a violation of the antitrust laws, and it is not clear whether even a concerted decision among all of the businesses in an industry to keep one of their new products from reaching consumers would be an antitrust violation. Cf. Oahu Gas Serv., Inc. v. Pacific Resources Inc., 838 F.2d 360, 369 (9th Cir. 1988) ("A line of `product innovation' cases has consistently rejected antitrust liability for a monopolist's decision about when or whether to market new products."); Foremost Pro Color, Inc. v. Eastman Kodak Co., 703 F.2d 534, 544-46 (9th Cir. 1983). In Foremost Pro, the court observed that a business's decision to delay introducing a new product would not restrain competition, as consumers would still be able to choose among existing products by that business or its competitors. See id. at 545. The court went on to conclude:

22

agreement among competitors to suppress information on the dangers of their product might constitute an antitrust violation if the conspiracy artificially raised the price consumers were willing to pay for the product. Here, however, the plaintiffs do not allege (and could not plausibly allege) that consumers' paying higher prices for tobacco products injured the Funds. On the contrary, these

_____

It is appropriate to emphasize that as a general rule, "any firm, even a monopolist, may . . . bring its products to market whenever and however it chooses." [Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 286 (2d Cir. 1979)]. Without more, it is not unlawful for any competitor in any market to delay the introduction of a new product or an entire line of new products until, as[plaintiff] alleged
in this case, the competition forces such introduction. In order to state a claim for relief under section 2 [of the Sherman Act], product
introduction must be alleged to involve some associated conduct which constitutes an anticompetitive abuse or leverage of monopoly power, or a predatory or exclusionary means of attempting to monopolize the relevant market, rather than aggressive competition on the merits.

Id. at 545-46 (omission in original).

We do not decide here whether this reasoning holds true when competitors--rather than a single monopolist--agree to "delay the introduction of a new product or an entire line of new products," but it is at least unclear whether such an agreement would constitute an antitrust violation absent allegations that the delayed introduction of the
product involved an attempt to artificially raise prices for existing products, exclude non-conspiring competitors from a market, or accomplish some other conventional anticompetitive effect. See, e.g., United States v. Container Corp. of Am., 393 U.S. 333, 335-37 (1969) (noting that, while an agreement to exchange price information would be a "conspiracy" under the Sherman Act, it would constitute an antitrust violation only if it restrained trade, by, for example, limiting or reducing
price competition); cf. American Tobacco Co. v. United States, 328 U.S. 781, 809 (1946) ("It is not the form of the combination or the particular means used but the result to be achieved that the statute condemns."). While we do not decide whether an agreement among competitors to withhold a new product from a market would constitute an antitrust violation, we assume for the sake of assessing plaintiffs' antitrust standing that the conduct in which defendants allegedly engaged would constitute such a violation.

23

higher prices more likely would have led fewer persons to purchase the products, thereby decreasing the costs (and injuries) to the Funds. Therefore, while there may be a causal relationship between the conduct of the defendants and the injuries alleged by the plaintiffs, we are uncertain that these injuries are connected to any conduct of the defendants that violates the antitrust laws. See supra note 7.

ii. Nature and Directness of Injury

In analyzing the third and fourth factors, the Court in AGC observed that the plaintiff union was neither a consumer (as the plaintiff in McCready was) nor a competitor within the market that allegedly had been restricted (i.e., the market for building subcontracts). Further, its alleged harm was indirect because it claimed that the defendants conspired to induce third parties to do business with nonunion contractors instead of union contractors, and the plaintiff union was harmed only because it had contracts with the latter and not the former. The Court concluded that "the Union is neither a participant in the market for construction contracts or subcontracts nor a direct victim of the defendants' coercive practices." AGC, 459 U.S. at 540 n.44. This analysis inveighs against plaintiffs' position.8  The Court's holding in AGC that the union did not have standing also undercuts the Funds' argument that the foreseeability of their injury

_____

8. The Funds contend that there is an exception to the general rule that an antitrust plaintiff be either a consumer or competitor of the defendant's. See Appellants' Br. at 42-45. It is true that, drawing on language from McCready, 457 U.S. at 483-84, we have sometimes expressed the injury requirement in terms of the harm being "inextricably intertwined" with the defendant's wrongdoing. See, e.g., Gulfstream III Assocs., 995 F.2d at 429 (holding that plaintiff's injury may flow from defendant's wrongdoing if "there exists a `significant causal connection' such that the harm to the plaintiff can be said to be `inextricably intertwined' with the antitrust conspiracy" (citation to McCready and other cases omitted)). The simple invocation of this phrase, however, will not allow a plaintiff to avoid the fundamental requirement for antitrust standing that he or she have suffered an injury of the type--almost exclusively suffered by consumers or competitors-- that the antitrust laws were intended to prevent.

24

strongly favors our finding that proximate cause exists here. See Appellants' Br. at 25. No doubt the defendants in AGC foresaw that their conspiracy favoring nonunion contractors would harm the unions that had contracts with the target of the conspiracy--unionized contractors. Yet this foreseeability was insufficient to overcome the remoteness of the union's injury from the defendants' wrongdoing.

Our analysis of the first four AGC factors counsels against recognition of the Funds' claims based simply on indirect cost increases from smoking-related illnesses. The Funds are not consumers forced to pay higher prices for tobacco products or competitors harmed by defendants' ability to conceal the unsafe nature of their products. They are simply some of the many groups or individuals suffering the financial or medical repercussions of the decades-long marketing of a product that we now know is demonstrably unsafe. Cf. Barton & Pittinos, Inc. v. SmithKline Beecham Corp., 118 F.3d 178, 181 (3d Cir. 1997) ("If the injury is not of the requisite type, even though the would-be plaintiff may have suffered an injury as a result of conduct that violated the antitrust laws, he or she has no standing to bring a private action under the antitrust laws to recover for it.").

However, the Funds' claims of direct injury include allegations that they were in the market for safer tobacco products or for products that would reduce or prevent people from smoking. Therefore, these claims might meet the third factor from AGC. If the Funds were consumers in a market for information and products that would have reduced their expenditures (because they allegedly would have provided the information and products to their participants, some of whom would have smoked less and become less ill), their asserted injuries--as consumers-- may be of the appropriate type.

The Funds' claims of direct injury might also meet the fourth factor from AGC, which focuses on the directness or indirectness of the alleged injury. Subsumed in the "directness" factor is also the issue of whether other, more directly injured parties could vindicate the policies underlying the antitrust laws: "The existence of an identifiable class of persons whose self-interest would

25

normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party such as the Union to perform the office of a private attorney general." AGC, 459 U.S. at 542. While more directly injured parties existed in AGC (i.e., unionized subcontractors who were the target of the boycott), this is not necessarily the case here. Smokers can sue for personal injuries arising from smoking, but they are unlikely (or unable) to press antitrust claims against the tobacco companies.

Although we acknowledge that plaintiffs' claims of direct injury appear, at least initially, to meet a number of the first four AGC factors, we question whether these direct injuries are necessarily more direct than the indirect injuries on which much of our discussion has focused. Under plaintiffs' direct theory, the tobacco companies' conduct aimed at the Funds induced the Funds to not take certain actions, which led to a greater incidence of smoking (and of smokers using more dangerous products), which led to more illness, which led to increased health care expenditures being borne by the plaintiffs. Although the alleged wrongdoing was more directly aimed at the Funds, the injury itself certainly was no more direct than the indirect injury that arose from the defendants' actions toward smokers.

In another union fund case, a district court focused on this alleged direct injury in partially denying the defendants' motion to dismiss. In that case, the court analogized the direct-injury claim to a hypothetical case in which a defendant fraudulently induced health funds into reimbursing participants for a dangerous medical procedure that then harmed these participants. See New Jersey Carpenters Health Fund v. Philip Morris, Inc., 17 F. Supp. 2d 324, 332–33 (D.N.J. 1998). In such a case, the court believed, the funds would have a cause of action against the defendant for their economic damages caused by the fund participants' use of the procedure that the funds were wrongfully induced to cover.

We are not convinced, as the district court in New Jersey Carpenters was, that this hypothetical case presents a causation chain similar to the Funds' direct claim in the

26

present case. First, in the hypothetical case, the defendant fraudulently induced the plaintiffs to spend money that redounded directly to defendant's benefit (i.e., the funds paid for the procedure that the defendant invented). In a sense, this is no different than a garden-variety fraud case in which the defendant hoodwinks the plaintiff into giving him "money for nothing." In the present case, plaintiffs' direct-injury claim is that the tobacco companies fraudulently induced the Funds to not spend money (on safer-smoking or smoking-cessation products) that, if spent, would have diminished a separate revenue stream (i.e., smokers' purchase of tobacco products) for the defendants. We view this as an indirect connection. In addition, in the New Jersey Carpenters hypothetical, the fraud essentially induced the plaintiffs to enter into the relationship that caused their injury: The defendant induced the plaintiffs to "cover" the cost of defendant's faulty procedure. In the present case, the relationship that links the smokers' illnesses with the Funds already exists: The plaintiffs are already (apart from anything the tobacco companies do) "covering" the costs of the smokers' illnesses. The alleged fraud simply prevents them from reducing their expenses arising out of this preexisting relationship.

Our belief that the plaintiffs' direct claim comes no closer than their indirect claim to meeting the proximate cause requirement for antitrust standing is supported by the dearth of discussion of this allegedly unique claim in plaintiffs' complaint and brief to this Court. See Appellants' Br. at 21–22 (discussing "direct" injury); id. at 23–39 (discussing "indirect" injury); see also infra note 11 (noting minimal allegations of "direct" injury in complaint). At all events, as is clear from our extensive review of all of the AGC factors, we find that however plaintiffs characterize their claims--as direct or indirect--they necessarily fail for being too remotely connected in the causal chain from any wrongdoing on defendants' part.

iii. Speculativeness of Damages and Trial Complexity

We find that AGC's sixth factor does not militate against a finding of antitrust standing, as there is little danger of

27

duplicative litigation9 or complex apportionment of damages among various groups of plaintiffs.10 However, the Funds' damages claims are quite speculative (and very difficult to measure), implicating AGC's fifth factor. The Funds argue that damages may be easily calculated by aggregation and the application of statistical models. We question how easy this process would be. The Funds' alleged damages are said to arise from the fact that the tobacco companies prevented the Funds from providing smoking-cessation or safer-smoking information to their participants, some of whom would have allegedly quit smoking or begun smoking safer

_____

9. The defendants complain that allowing the Funds to recover for their health care expenditures creates a danger of duplicative recovery in general (if not duplicative antitrust or RICO damages), because of Pennsylvania's collateral source rule. See, e.g. , Johnson v. Beane, 664 A.2d 96, 100 (Pa. 1995) ("The collateral source rule provides that payments from a collateral source shall not diminish the damages otherwise recoverable from the wrongdoer."). The collateral source rule, however, is aimed at preventing a tortfeasor from benefitting from a third party's payment to the injured party. If the tortfeasor himself has already
paid a portion of the injured party's damages, his own liability is correspondingly reduced. See, e.g., Restatement (Second) of Torts S 920A(1) (1979). We are uncertain how this latter principle would apply when the tortfeasor pays a portion of the injured party's damages indirectly--i.e., through the third party payer's separate action against the tortfeasor for recovery of the third party's payments to the injured party. We need not predict whether Pennsylvania courts would apply the collateral source rule in this context, however, as we do not rely on defendants' invocation of the rule to support our holding.

10. However, to the extent that Fund participants have not been reimbursed for certain health care expenditures or have suffered some other pecuniary loss as a result of the tobacco companies' alleged conspiracy, they could bring their own antitrust claims (as well as personal injury claims) against the defendants. For example, as we noted supra at 22-24 & note 7, it is possible that the defendants were able to artificially increase the price of their products by conspiring to hide a major defect in these products and by inducing consumers to buy their products through fraudulent claims regarding their safety. While we have questioned the Funds' ability to state a claim for higher priced tobacco products, consumers who paid these higher prices would possibly be able to bring an antitrust or RICO claim. Therefore, to some minimal extent at least, an apportionment of damages between health care payers and smokers might be necessary.

products, reducing their smoking-related illnesses, and thereby lowering the Funds' costs for reimbursing smokers' health care expenditures. In order to calculate the damages --i.e., the costs not lowered due to the antitrust conspiracy --the Funds must demonstrate how many smokers would have stopped smoking if provided with smoking-cessation information, how many would have begun smoking less-dangerous products, how much healthier these smokers would have been if they had taken these actions, and the savings the Funds would have realized by paying out fewer claims for smoking-related illnesses.

It is apparent why the Funds argue that they can demonstrate all of this through aggregation and statistical modeling: it would be impossible for them to do so otherwise. Cf. Barnes v. American Tobacco Co., 161 F.3d 127, 143 (3d Cir. 1998) (affirming denial of class certification in statewide smokers' suit, because "addiction, causation, the defenses of comparative and contributory negligence, the need for medical monitoring and the statute of limitations present too many individual issues to permit certification"). Yet we do not believe that aggregation and statistical modeling are sufficient to get the Funds over the hurdle of the AGC factor focusing on whether the "damages claim is . . . highly speculative." AGC, 459 U.S. at 542.

In some litigation contexts, there is a meaningful distinction between damages that are completely incapable of determination and those that are difficult to determine but are nonetheless measurable. In those contexts, if the latter is the case, aggregation and statistical modeling may be appropriate (though we need not decide that issue here) to allow plaintiffs to overcome the difficulty of proving the amount of damages. Cf. Hilao v. Estate of Marcos, 103 F.3d 767, 782-87 (9th Cir. 1996) (allowing use of aggregation and statistical analysis to determine compensatory damages). But cf. Arch v. American Tobacco Co., 175 F.R.D. 469, 493 (E.D. Pa. 1997) (rejecting use of statistical evidence to overcome need to prove individual damages in putative class action). In the present context, however, a finding of antitrust standing must precede a finding of liability, which itself precedes the assessment of damages. Therefore, the fact that "once liability is established,

29

plaintiff's proof of damages will be evaluated under a more lenient standard," Danny Kresky Enters. v. Magid, 716 F.2d 206, 212 (3d Cir. 1983), does not eliminate from our analysis of the AGC factors the speculative (though potentially measurable) nature of plaintiffs' damages. This speculativeness strongly militates against plaintiffs' position.

iv. The AGC Factors Applied: Summary

Against this somewhat lengthy background, we can now summarize our review of the AGC factors in this case: First, some causal connection appears to exist between the conduct of the tobacco companies and the injury suffered by the plaintiff Funds--though we doubt that this connection links some antitrust wrongdoing with an antitrust injury. Second, plaintiffs have alleged, if barely, that the defendants' conspiracy specifically targeted them, though for the most part their complaint alleges that the plaintiffs were targeted along with "consumers, state and federal governments, medical and health care entities, and the public at large." Compl. P 244.11 Third, at least some aspect of the plaintiffs' alleged injury--their inability to obtain and use information on the dangers of smoking or on smoking-cessation methods--may be of the type that the antitrust laws are intended to prevent, i.e., the restriction of consumer choices, which leads to increased costs for these consumers. However, the tenuous causal connection, the sketchy allegations of defendants' intent to target the Funds, and the minimal extent to which plaintiffs' injuries relate to the purposes of the antitrust laws are all

_____

11. Plaintiffs rely, both in attempting to distinguish their claims from traditional subrogation claims and in their efforts to avoid the import of AGC, on the alleged direct targeting of the Funds by the tobacco companies. Yet, we find scant mention of this direct targeting in plaintiffs' lengthy complaint and, when specifically asked by us to cite portions of the complaint that address this aspect of their case, plaintiffs
could muster only three arguably relevant paragraphs (out of 317). See Appellants' Letter Br. of Jan. 25, 1999, at 2. While plaintiffs urged us, at oral argument, to remand so that they might amend their complaint to include more specific allegations of direct targeting by the defendants,
see Tr. of Oral Argument at 18-19, we decline to do so, as the possibly inadequate pleading is not a factor in our holding.

substantially outweighed by the fourth AGC factor, the indirectness of the asserted injury.

The sheer number of links in the chain of causation that connect the defendants' suppression of information on the dangers of their products and withholding of safer tobacco products from the market to the Funds' increased expenditures are greater than in any case we canfind in which this court or the Supreme Court has found antitrust standing. These alleged links include the following: (1) the tobacco companies engaged in a conspiracy to suppress information and withhold products from the market; (2) the Funds were prevented from informing their members about the dangers of smoking and the availability of less dangerous products; (3) smokers continued to smoke dangerous tobacco products that they would not have otherwise used (or would have used less); (4) smokers contracted more smoking-related illnesses; and,finally, (5) the Funds suffered increased expenses due to their reimbursement of smokers' health care costs.

As to the final two AGC factors, there is only a slight possibility of duplicative antitrust recoveries or problems apportioning antitrust damages, because smokers are unlikely to make their own antitrust claims based on increased health care expenditures. However, the Funds' damages claims are highly speculative and would entail complex calculations potentially involving numerous individuals not party to this case, i.e., Fund participants who do smoke or have smoked in the past.

The short of it is that, while we find that the plaintiffs' antitrust claims barely meet certain AGC factors, the fulfillment of these factors is greatly outweighed by the extremely indirect nature of the Funds' injuries and the highly speculative and complex damages claims. The tortured path that one must follow from the tobacco companies' alleged wrongdoing to the Funds' increased expenditures demonstrates that the plaintiffs' claims are precisely the type of indirect claims that the proximate cause requirement is intended to weed out. Cf. Palsgraf v. Long Island R. Co., 162 N.E. 99, 103 (N.Y. 1928) (Andrews, J., dissenting) ("What we do mean by the word `proximate' is that, because of convenience, of public policy, of a rough

31

sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point.").

What is more, in proposing a solution to the speculative nature of their damages--i.e., using aggregation and statistical modeling to measure damages--the Funds focus too far down the road to assist their case for standing: The task of accurately measuring damages can be approached only after a plaintiff has met the requirements for standing and has proven liability. While we do not doubt that the Funds have paid out more in health care expenditures than they would have in the absence of tobacco products, "Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property." McCready, 457 U.S. at 477.

3. Lower Lake Erie

Our own precedent that provides the most support for plaintiffs' antitrust claim is In re Lower Lake Erie Iron Ore Antitrust Litigation, 998 F.2d 1144 (3d Cir. 1993). In that case, the district court dismissed for lack of antitrust standing one of plaintiffs' claims that was based on a theory similar to that put forth by plaintiffs here. The plaintiffs, various steel manufacturers and transportation companies, alleged that certain railroad companies conspired "to preclude potential competitors from entering the market of lake transport, dock handling, storage and land transport of iron ore." Id. at 1151. The steel companies' claim that was dismissed was "based on the theory that had the conspiracy not delayed the use of self-unloading vessels, the steel companies would have paid vessel companies a lower rate for lake transportation." Id. at 1154. The district court found that this claim failed, reasoning that "because the steel companies were only potential customers of non-conspiring competitors, (the vessel companies), damages could be ascertained only by speculating when the vessel companies would have begun using self-unloaders absent a conspiracy. Assessment of damages would also require additional conjecture related to the rates the private docks would have charged to handle the self-unloaders." Id.

32

After analyzing the factors from AGC, we disagreed with the district court's conclusion. First, we found that a direct causal relationship existed between the defendants' wrongdoing and the steel companies' alleged harm: "[D]elayed . . . introduction of the more efficient self-unloader . . . caused loss of the profits which would have been realized had the less costly transport system been in place," and "it was unquestionably the steel companies who bore the brunt of the increased costs attributed to the railroad's agreement to thwart development of the less expensive technology." Id. at 1168.12 This matches closely the Funds' theory in the present case: Delayed introduction of safer tobacco products caused higher costs than they would have faced had these products been allowed to enter the market, and it was health care payers who bore the brunt of the increased costs attributed to the tobacco companies' agreement to thwart development of safer tobacco products.

There is a key difference, however. In Lower Lake Erie, the use of more expensive unloaders––made necessary by the defendants' wrongdoing––caused a loss of profits for the plaintiffs without any intervening events.13 The inability to use cheaper unloaders, in and of itself, caused the plaintiffs' damages. Here, the alleged conspiracy that delayed introduction of safer tobacco products only caused damages to the plaintiff Funds after working its way

_____

12. We also found that the steel companies had alleged injuries of the type the antitrust laws were intended to prevent and that the existence of other parties with similar injuries did not "diminish the directness of the steel companies' injury." Lower Lake Erie, 998 F.2d at 1168-69. Our ultimate holding was that the plaintiffs' damages, arising from the conspirators' exclusion of lower-cost means of transportation from the market, conferred antitrust standing on the steel companies.

13. We note another key difference between Lower Lake Erie and the present case. In Lower Lake Erie, the defendants did not simply conspire to delay their own introduction of a new product, as is alleged here. Rather, they engaged in archetypal antitrust conduct (price-fixing, boycotts, refusals to sell, etc.) in order to prevent other parties in the unloader market from introducing and using self-unloaders. See Lower Lake Erie, 998 F.2d at 1153-54. There was no question, therefore, that specific antitrust wrongdoing could be linked to specific antitrust injury.
Cf. supra note 7.

through another party (i.e., smokers) and at least two more steps: First, without safer products or information on smoking-cessation, smokers continued to smoke dangerous tobacco products. Next, these smokers became more ill than they otherwise would have without the tobacco companies' alleged conspiracy. Only at this point did the Funds allegedly suffer damages from the increased costs of the smokers' illnesses.

This distinction between Lower Lake Erie and the present case illustrates the most fundamental flaw in plaintiffs' claims. The injuries that they allegedly suffered from defendants' wrongdoing are simply too remote from that wrongdoing to be cognizable under the antitrust laws. The causal links that plaintiffs must connect in order to make their case are just too numerous and too speculative to meet the requirements of AGC and of the Supreme Court's and this court's other antitrust precedents.

C. RICO Claims: Holmes v. SIPC

In Holmes v. Securities Investor Protection Corp., 503 U.S. 258 (1992), the Supreme Court held that its discussion of proximate cause and remoteness in cases such as McCready and AGC applied to the analysis of proximate cause in RICO cases as well. See Holmes, 503 U.S. at 268; see also McCarthy v. Recordex Serv., Inc., 80 F.3d 842, 855 (3d Cir. 1996) ("Significantly, antitrust standing principles apply equally to allegations of RICO violations."). Therefore, much (if not all) of what we have said above in our discussion of antitrust standing applies to the Funds' RICO claims. We discuss here, however, the specific requirements for stating a claim under RICO, to better explicate our reasons for finding that all of plaintiffs' claims must fail for being too remote and speculative.

In Holmes, the Court addressed the directness inquiry when it explained that "a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover." Holmes, 503 U.S. at 268-69. This was primarily because (1) the more indirect the injury, "the more difficult it becomes to ascertain the

34

amount of a plaintiff's damages attributable to[defendant's wrongdoing], as distinct from other, independent, factors"; (2) allowing recovery by indirectly injured parties would require complicated rules for apportioning damages; and (3) direct victims could generally be counted on to vindicate the policies underlying the relevant law. Id. at 269-70.

1. Directness of the Injury

The plaintiff in Holmes alleged that the defendants had conspired to manipulate certain stock prices, which led to losses for brokers, which led to the brokers' inability to return investments of customers who had not bought the manipulated stock.14 In the present case, the tobacco companies are in the position of the stock manipulators in Holmes, while the smokers––the third party linking the plaintiffs and defendants––are in the same position as the brokers; the plaintiff Funds, who suffered a loss because of the harm that the defendants brought upon the third party, are in the same position as the brokers' customers who did not invest in the manipulated stock.15  The Supreme Court

_____

14. The plaintiff in Holmes was actually a private nonprofit corporation, the Securities Investor Protection Corporation ("SIPC"), which was required by federal law to reimburse the losses of certain investors. After
paying for the losses of investors who had not invested in the defrauded securities, the SIPC asserted claims against those engaged in the fraud, as a subrogee. In discussing the causation chain in Holmes, we omit this additional link, as the SIPC stood in the investors' shoes for purposes of its claims.

15. In the present case, the allegations of fraud and conspiracy directed at the Funds themselves might make the Funds more like the brokers' customers who did buy the manipulated stock. The Court in Holmes noted that these customers might have a RICO claim against the defendants, though it declined to reach this issue. See Holmes, 503 U.S. at 272 n.19. We note, however, that the defrauded investors in Holmes would have been able to allege direct injury from the fraud (i.e., their losses derived directly from the fraud, without any intervening links), while the Funds here, even if they were direct targets of the tobacco companies' fraud, did not suffer damages until this fraud prevented them from encouraging their participants to smoke less or not at all, which led to an increased incident of smoking-related illnesses, which in turn led to the Funds' increased expenses. See supra at 26-27.

35

in Holmes held that the causal connection between the nonpurchasing investors and the stock manipulators was too attenuated for the plaintiffs to have RICO standing.

The Court reasoned as follows: "If the nonpurchasing customers were allowed to sue, the district court would first need to determine the extent to which their inability to collect from the broker-dealers was the result of the alleged conspiracy to manipulate, as opposed to, say, the broker-dealers' poor business practices or their failures to anticipate developments in the financial markets." Id. at 272-73. Applied to the present case, if the Funds are allowed to sue, the court would need to determine the extent to which their increased costs for smoking-related illnesses resulted from the tobacco companies' conspiracy to suppress health and safety information, as opposed to smokers' other health problems, smokers' independent (i.e., separate from the fraud and conspiracy) decisions to smoke, smokers' ignoring of health and safety warnings, etc.16 As in Holmes, this causation chain is much too speculative and attenuated to support a RICO claim.

2. Apportionment of Damages and Vindication by Oth ers

As noted above, the Court in Holmes expressed two further concerns (in addition to the directness factor) that supported its conclusion that nonpurchasing investors did not have standing: (1) the court would need to apportion treble damages between the brokers and the nonpurchasing customers, and (2) the brokers could vindicate the RICO claims themselves. See id. at 273. As we noted in our discussion of the Funds' antitrust claims, more directly injured parties, i.e., smokers, would be unlikely to bring

_____

16. While this complex determination militates against allowing the Funds to bring their remote claim, it addresses one of defendants' objections, that allowing the Funds (rather than smokers) to bring claims for smoking-related illnesses would nullify the defendants' traditional defenses, such as assumption of risk and comparative negligence. These defenses presumably would be available in the present case, in the sense that smokers' own wrongdoing (or ignoring of known risks) would be a factor in establishing and measuring the link between the tobacco companies' actions and the Funds' damages.

36

federal claims against the tobacco companies for the same damages claimed by the Funds. Yet, as we also noted above, Fund participants who have not been fully reimbursed for their out-of-pocket costs that are traceable to defendants' alleged fraud and conspiracy might bring RICO or antitrust claims. Therefore, as in Holmes, a court adjudicating the Funds' RICO claims would need to consider the appropriate apportionment of damages between smokers and others such as the Funds who suffered economic losses as a result of the tobacco companies' alleged fraudulent acts.

It is true that the final concern--that another party could better vindicate the RICO claims--may not be as fully applicable to this case as to Holmes because the Funds allege that they suffered far greater economic damages than smokers themselves, many of whom were reimbursed for their direct pecuniary losses. Yet we are unconvinced that this distinction is sufficient to overcome the concerns about apportioning damages and, most fundamentally, the remoteness of the Funds' alleged RICO injuries from any wrongdoing on the part of the tobacco companies. Cf. Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 521 (3d Cir. 1998) (finding RICO standing when defendant targeted plaintiff 's contractual partner, plaintiff's injury arose from loss of that contract, and that contractual relationship "was a direct target of the alleged scheme--indeed, interference with that relationship may well be deemed the linchpin of the scheme's success").[17]

_____

17. Because of our conclusion that plaintiffs' RICO and common-law fraud claims fail for lack of proximate cause, we need not reach defendants' alternative argument that these claims were not pled with sufficient particularity. See Fed. R. Civ. P. 9(b) ("In all averments of fraud
. . ., the circumstances constituting fraud . . . shall be stated with particularity."). We note, however, that plaintiffs' allegations are fairly
general in nature and do not include "specific allegations as to which fraudulent tactics were used against" specific plaintiffs. Rolo v. City Investing Co. Liquidating Trust, 155 F.3d 644, 659 (3d Cir. 1998). On the other hand, we have cautioned that courts should "apply the rule with some flexibility and should not require plaintiffs to plead issues that may
have been concealed by the defendants," id. at 658, as is alleged to have happened here.

D. Summary of Federal Claims

At this point in contemporary history, there can be little doubt that the tobacco companies' products have caused smokers to contract certain illnesses and that the plaintiff Funds (and others) have borne some of the costs of these illnesses by reimbursing their participants for their health care expenditures. It is therefore quite possible that some of these health care providers and payers have had to cut back on their coverage of other medical problems in order to fund the costs of smoking-related illnesses, causing other Fund participants to pay out-of-pocket expenses they otherwise would not have paid. It also may be the case that unions and their members have been forced to accept lower wage increases or to forgo benefit improvements in order to achieve contract settlements with employers that included sufficient contributions to the Funds to pay for smoking-related illnesses. All of these parties--non-smoking Fund participants, unions, union members, employers--can claim to have suffered some injury arising out of the tobacco companies' conduct. At some point, however, the causal link between defendants' actions and the negative effects that eventually result is not proximate enough to meet the prudential requirements for antitrust or RICO standing. In this case, for the reasons set forth supra at 17-37, we believe that this necessary proximate-cause connection is missing.18 Therefore, plaintiffs' federal claims based on alleged violations of the antitrust laws and the RICO statute were properly dismissed by the District Court.

_____

18. There is arguably a tension between our decision here that the tobacco companies cannot be held liable for the damages suffered by entities that paid for smoking-related illnesses, and the fact that these same tobacco companies recently agreed to pay more than $200 billion to settle claims brought by attorneys general for the states' similar costs of their citizens' smoking-related illnesses. We note in this regard that an explanation for the putative tension may be found in any number of places, including state laws conferring standing and broad rights of recovery on states for wrongdoing against their citizens or their coffers, as well as the political power of governmental bodies--and the threat of legislative action--that is lacking in this case brought by private entities.
We need not, of course, engage these matters here.

38

III. Plaintiffs' State-Law Claims

The same principles that lead us to conclude that plaintiffs' antitrust and RICO claims were properly dismissed lead to the inevitable conclusion that their state-law claims must also fail.

A. Fraudulent Misrepresentation

While the District Court dismissed the Funds' remaining claims for the same reasons it found the antitrust and RICO claims wanting, i.e., lack of proximate cause and lack of cognizable injury, it also dismissed them for claim-specific reasons. The District Court found plaintiffs' state-law fraud claims too speculative to be cognizable. See Steamfitters, 1998 WL 212846, at *3. Just as we have found the link between defendants' alleged fraud--providing false information regarding the safety of their products-- and plaintiffs' alleged injuries too attenuated to support a RICO claim, we also find the link too remote to support a common-law fraud claim. See Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994) (requiring proximate cause as an element of fraudulent misrepresentation claim); see also Crawford v. Pituch, 84 A.2d 204, 207 (Pa. 1951) (holding that recoverable damages in a fraud case do not include those that are "consequential, speculative and even conjectural," but "only such as can be said to have been the immediate and proximate consequences of the deceit practiced upon the plaintiffs").19 For this reason, we agree with the District

_____

19. We recently held that a common-law fraud claim might succeed despite the fact that the fraudulent misrepresentation was made to a third party (as is true in the present case for the Funds' claims of indirect injury). See In re Orthopedic Bone Screw Prods. Liab. Litig., 159 F.3d 817 (3d Cir. 1998). In Orthopedic Bone Screw, we held that "the mere fact that the alleged fraudulent misrepresentation was made to [a third party] and not the plaintiffs does not necessarily preclude a finding
of legally sufficient causation," id. at 826, when the plaintiffs alleged that
fraud on the third party (a government agency) led to approval of products that then were used by plaintiffs and caused them injuries. Id. at 827. We also held that a misrepresentation claim is not necessarily precluded when the alleged injury arises from a third party's (and not the plaintiff 's) reliance on defendant's misrepresentations. See id. at

39

Court that plaintiffs cannot maintain their state fraud claims.

B. Injunctive Relief

If the plaintiffs have antitrust standing for their damages claim, they almost certainly would have standing to seek injunctive relief, as the standard is lower for such a claim. See McCarthy, 80 F.3d at 856 (only proximate cause and "threatened loss or injury cognizable in equity" are required for injunctive relief under the antitrust laws). However, as we have detailed above, the necessary element of proximate cause is missing and therefore, just as plaintiffs lack standing to seek damages for their alleged injuries, they lack antitrust standing for equitable relief as well.[20]

C. Special Duty

The defendants maintain, and the District Court held, that a special-duty claim in Pennsylvania requires averments of physical injury. Whether or not this view is correct (and we take no position on it),[21] we conclude that plaintiffs' special-duty claim too must fail.

_____

828-29. These holdings, however, do not help plaintiffs in the present case. Even if the fact that the tobacco companies' misrepresentations were made primarily to smokers is not sufficient to defeat the common-law fraud claims, the harm that flowed from this fraud is much more attenuated than that in Orthopedic Bone Screw, in which the plaintiffs were directly harmed by their use of a product that was only available because of the defendants' misrepresentations to the third party.

20. This court has yet to decide whether injunctive relief is available for a private party under RICO. See Northeast Women's Ctr., Inc. v. McMonagle, 868 F.2d 1342, 1355 (3d Cir. 1989). Other circuits are split on this issue. See Conkling v. Turner, 18 F.3d 1285, 1296 & n.8 (5th Cir. 1994) (detailing circuit split). Given the lack of proximate cause in this case, the remoteness of plaintiffs' alleged injury from defendants' alleged wrongdoing, and our holding that plaintiffs' damages claims do not survive defendants' motion to dismiss, we need not reach this issue in the present case.

21. The Pennsylvania Superior Court case relied on by the District Court and the defendants for the proposition that a special-duty claim requires

40

Special-duty claims arise most often in the context of the provision of public or commercial services. See, e.g., Yates v. City of Philadelphia, 578 A.2d 609, 611 (Pa. Commw. Ct. 1990) ("[A] special relationship is found only where an individual is exposed to a special danger and the authorities have undertaken the responsibility to provide adequate protection for him or her . . . ."); Restatement (Second) of Torts S 323 (1965) ("One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking."); see also Morena v. South Hills Health Sys., 462 A.2d 680, 684 (Pa. 1983) (adopting Restatement section 323(a) as the applicable law in Pennsylvania).

Converting a company's marketing into a special undertaking to inform the public about the known risks of its products would subject every manufacturer that advertises its products to liability for a "special duty" created by such marketing, and that duty would be violated by every material omission in such advertising. We are unwilling to so dramatically extend the scope of liability for a state-law cause of action. Cf. DeJesus v. Liberty Mut. Ins. Co., 223 A.2d 849, 850 (Pa. 1966) (holding that no special duty arises from workers' compensation insurance company's "advertising material representing that it provides loss prevention service and safety counsel to its policyholders" when plaintiff-worker did not aver that "the advertisements were part of any contract or other legal obligation undertaken by [the insurance company] or that

_____

allegations of personal physical injury did not so hold. See Lower Lake Dock Co. v. Messinger Bearing Corp., 577 A.2d 631, 635 (Pa. Super. Ct. 1990) (noting that prior Pennsylvania cases applying the special-duty rule did so only when there was physical injury or damages to property other than the allegedly defective one). We believe that the law on this issue is more uncertain in Pennsylvania than the defendants claim.

41

they adversely affected [the plaintiff]"). 22 Finally, a special-duty claim is effectively a negligence cause of action, and therefore requires the element we have found missing from plaintiffs' case, proximate cause. See Morena, 462 A.2d at 684 & n.5 (noting that the plaintiff in a special-duty case must still prove the underlying elements of a negligence claim, including proximate cause).

D. Unjust Enrichment

Unjust enrichment is typically invoked in a quasi-contractual setting, when plaintiff seeks to recover from defendant for a benefit conferred under an unconsummated or void contract. See, e.g., Zvonik v. Zvonik, 435 A.2d 1236, 1239-40 (Pa. Super. Ct. 1981); cf. Meehan v. Cheltenham Township, 189 A.2d 593, 595 (Pa. 1963) (noting that unjust enrichment is an equitable remedy, requiring for recovery that there be both "(1) an enrichment, and (2) an injustice resulting if recovery for the enrichment is denied").

In the tort setting, an unjust enrichment claim is essentially another way of stating a traditional tort claim (i.e., if defendant is permitted to keep the benefit of his tortious conduct, he will be unjustly enriched). As the Restatement of Restitution puts it:

> The desirability of permitting restitution in [tort] cases is ordinarily not so obvious as in the cases where there has been no tort since the tortfeasor is always subject to liability in an action for damages and . . . the right to maintain an action for restitution in such cases is largely the product of imperfections in the tort remedies, some of which imperfections have now been removed.

Restatement of Restitution S 3 cmt. a (1937); see also id. at ch. 7 introductory note ("Actions of tort are ordinarily not restitutionary . . . . They are based primarily upon wrongdoing and ordinarily, through the payment of money,

_____

22. Of course, a company's failure to inform consumers about the known risks of its products would be relevant to the duty-to-warn aspect of a products liability claim. See Restatement (Second) of Torts S 402A cmt. j (1965).

42

compensate the injured person for the harm suffered by him as a result of the wrongful conduct, irrespective of the receipt of anything by the defendant."). We can find no justification for permitting plaintiffs to proceed on their unjust enrichment claim once we have determined that the District Court properly dismissed the traditional tort claims because of the remoteness of plaintiffs' injuries from defendants' wrongdoing.[23]

For the foregoing reasons, the District Court's judgment dismissing plaintiffs' complaint in its entirety will be affirmed.

_____

23. The District Court did not specifically address plaintiffs' strict liability, negligence, and breach-of-warranty claims, but these claims fail
as well, for each requires a proximate connection between the defendants' conduct and the plaintiffs' injuries, a connection we find missing in this case. See, e.g., Davis v. Berwind Corp., 690 A.2d 186, 190 (Pa. 1997) ("To recover under [strict liability], a plaintiff must establish . . . that the defect was a proximate cause of the plaintiff 's injuries . . . ."); Skipworth ex rel. Williams v. Lead Indus. Ass'n, 690 A.2d
169, 172 (Pa. 1997) ("Pennsylvania . . . follows the general rule that a plaintiff, in order to recover, must establish that a particular defendant's
negligence was the proximate cause of her injuries."); AM/PM Franchise Ass'n v. Atlantic Richfield Co., 584 A.2d 915, 923 n.12 (Pa. 1990) ("As with all cases involving breach of warranty, the plaintiff is charged with the burden of proving that the defendant's breach is the proximate cause of the harm suffered.").

43

Appendix

Government Bodies as Plaintiffs

Arizona v. American Tobacco Co., No. CV-96-14769 (Ariz. Super. Ct. May 27, 1997) (denying motion to dismiss)

Idaho v. Philip Morris, Inc., No. CV-OC-97-03239*D (Idaho Dist. Ct. Sept. 2, 1998) (denying motion to dismiss consumer protection claims, but dismissing antitrust, nuisance, and conspiracy claims)

Illinois v. Philip Morris, Inc., No. 96L 13146 (Ill. Cir. Ct. Nov. 13, 1997) (denying motion to dismiss state antitrust, negligence, and civil conspiracy claims, but dismissing special duty, nuisance, and unjust enrichment claims)

Indiana v. Philip Morris, Inc., No. 49D07-9702-CT-003236 (Ind. Super. Ct. July 23, 1998) (dismissing conspiracy, antitrust, unjust enrichment, indemnity, assumed duty, criminal mischief, and nuisance claims)

Iowa ex rel. Miller v. Philip Morris, Inc., 577 N.W.2d 401 (Iowa 1998) (affirming dismissal of deception, special duty, and indemnity claims)

County of Los Angeles v. R.J. Reynolds Tobacco Co., No. 707651 (Cal. Super. Ct. Dec. 23, 1997) (dismissing breach of warranty, fraud, strict liability, and negligence claims with leave to amend), petition for review granted, No. S068747, 1998 Cal. LEXIS 2475 (Cal. Apr. 22, 1998)

Maryland v. Philip Morris, Inc., No. 96122017, 1997 WL 540913 (Md. Cir. Ct. May 21, 1997) (denying motion to dismiss consumer protection and antitrust claims, but dismissing unjust enrichment, special duty, fraud, breach of warranty, negligence, strict liability, and conspiracy claims with leave to amend)

City & County of San Francisco v. Philip Morris, Inc., 957 F. Supp. 1130 (N.D. Cal. 1997) (dismissing RICO, negligent misrepresentation, special duty, warranty, and unjust enrichment claims with leave to amend), and No. C-96-2090 DLJ, 1998 WL 230980 (N.D. Cal. Mar. 3, 1998) (denying motion to dismiss fraud and certain special duty claims, but dismissing other special duty claims)

44

Texas v. American Tobacco Co., 14 F. Supp. 2d 956 (E.D. Tex. 1997) (denying motion to dismiss RICO claims, but dismissing antitrust, unjust enrichment, and nuisance claims)

Washington v. American Tobacco Co., No. 96-2-15056-8 SEA, 1996 WL 931316 (Wash. Super. Ct. Nov. 19, 1996), and 1997 WL 714842 (Wash. Super. Ct. June 6, 1997) (denying motion to dismiss state antitrust claims, but dismissing special duty and unjust enrichment claims)

Union Funds as Plaintiffs

Hawaii Health & Welfare Trust Fund for Operating Eng'rs v. Philip Morris, Inc., No. 97-00833 SPK (D. Haw. Jan. 25, 1999) (dismissing RICO, antitrust, false advertising, and special duty claims)

International Bhd. of Teamsters Local 734 Health & Welfare Trust Fund v. Philip Morris, Inc., __ F. Supp. 2d __, Nos. 97-C-8113 & -8114, 1998 WL 849528 (N.D. Ill. Dec. 1, 1998) (dismissing antitrust, special duty, strict liability, negligence, breach of warranty, fraud, unjust enrichment, and conspiracy claims)

Iron Workers Local Union No. 17 Ins. Fund v. Philip Morris, Inc., 23 F. Supp. 2d 771 (N.D. Ohio 1998) (denying motion to dismiss RICO, antitrust, and conspiracy claims)

Kentucky Laborers Dist. Council Health & Welfare Trust Fund v. Hill & Knowlton, Inc., 24 F. Supp. 2d 755 (W.D. Ky. 1998) (denying motion to dismiss some RICO and deceit claims, but dismissing other RICO claims and antitrust, fraud, special duty, and unjust enrichment claims)

Laborers & Operating Eng'rs Util. Agreement Health & Welfare Trust Fund v. Philip Morris, Inc., No. CIV 97-1406 PHX SMM (D. Ariz. Feb. 10, 1999) (dismissing RICO, antitrust, fraud, assumed duty, and unjust enrichment claims)

Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., 7 F. Supp. 2d 277 (S.D.N.Y.) (denying motion to

45

dismiss fraud, special duty, and RICO claims, but
dismissing unjust enrichment and antitrust claims),
interlocutory appeal granted, 7 F. Supp. 2d 294 (S.D.N.Y.
1998), appeal docketed, No. 98-7944 (2d Cir. argued Feb.
4, 1999)

National Asbestos Workers Med. Fund v. Philip Morris, Inc.,
23 F. Supp. 2d 321 (E.D.N.Y. 1998) (denying motion to
dismiss RICO, unjust enrichment, indemnity, and
assumed duty claims)

New Jersey Carpenters Health Fund v. Philip Morris, Inc., 17
F. Supp. 2d 324 (D.N.J. 1998) (denying motion to dismiss
certain fraud and RICO claims, but dismissing antitrust,
special duty, and unjust enrichment claims)

New Mex. & West Tex. Multi-Craft Health & Welfare Trust
Fund v. Philip Morris, Inc., No. CV-97-09118 (N.M. Dist.
Ct. Dec. 24, 1998) (dismissing all claims)

Northwest Laborers-Employers Health & Sec. Trust Fund v.
Philip Morris, Inc., No. C97-849WD (W.D. Wash. Dec. 23,
1998) (denying motion to dismiss)

Operating Eng'rs Local 12 Health & Welfare Trust v.
American Tobacco Co., No. BC 177968 (Cal. Super. Ct.
July 9, 1998) (dismissing strict liability, special duty,
breach of warranty, restitution, and unjust enrichment
claims without leave to amend, and dismissing fraud and
conspiracy claims with leave to amend)

Operating Eng'rs Local 324 Health Care Fund v. Philip
Morris, Inc., No. 97-741291 CZ (Mich. Cir. Ct. Feb. 12,
1999) (dismissing all claims)

Oregon Laborers-Employers Health & Welfare Trust Fund v.
Philip Morris, Inc., 17 F. Supp. 2d 1170 (D. Or. 1998)
(dismissing antitrust, RICO, consumer protection, unjust
enrichment, indemnity, assumed duty, and conspiracy
claims)

Seafarers Welfare Plan v. Philip Morris, Inc., 27 F. Supp. 2d
623 (D. Md. 1998) (dismissing RICO, antitrust, tort,
consumer protection, and unjust enrichment claims)

Southeast Fla. Laborers Dist. Health & Welfare Trust Fund
v. Philip Morris, Inc., No. 97-8715-CIV-RYSKAMP, 1998

WL 186878 (S.D. Fla. Apr. 13, 1998) (dismissing fraud, special duty, unjust enrichment, RICO, and antitrust claims)

Stationary Eng'rs Local 39 Health & Welfare Trust Fund v. Philip Morris, Inc., No. C-97-01519 DLJ, 1998 WL 476265 (N.D. Cal. Apr. 30, 1998) (denying motion to dismiss negligent breach of special duty claim, but dismissing fraud claims with leave to amend, and dismissing RICO, antitrust, intentional breach of special duty, unfair trade, and unjust enrichment claims without leave to amend)

Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., __ F.3d __, No. 98-1426 (3d Cir. Mar. 1999) (affirming dismissal of RICO, antitrust, fraud, special duty, unjust enrichment, strict liability, negligence, and breach of warranty claims)

Texas Carpenters Health Benefit Fund v. Philip Morris, Inc., 21 F. Supp. 2d 664 (E.D. Tex. 1998) (dismissing RICO, antitrust, tort, breach of warranty, and unjust enrichment claims)

West Va. Laborers' Pension Trust Fund v. Philip Morris, Inc., No. 3:97-0708 (S.D. W. Va. Aug. 12, 1998) (denying motion to dismiss)

West Va.-Ohio Valley Area I.B.E.W. Fund v. American Tobacco Co., No. 2:97-0978 (S.D. W.Va. Aug. 11, 1998) (denying motion to dismiss)

Other Health Care Payers as Plaintiffs

Minnesota v. Philip Morris, Inc., 551 N.W.2d 490 (Minn. 1996) (affirming denial of motion to dismiss state antitrust, consumer protection, and equitable claims, but dismissing tort claims)24

Regence Blue Shield v. Philip Morris, Inc., No. C98-559R, 1999 U.S. Dist. LEXIS 1820 (W.D. Wash. Jan. 6, 1999) (dismissing RICO, antitrust, fraud, special duty, unjust enrichment, and conspiracy claims)

_____

24. --Although the State of Minnesota is the nominal plaintiff in this case, the state supreme court's decision addressed only those claims brought by Blue Cross.

Williams & Drake Co. v. American Tobacco Co., No. 98-553 (W.D. Pa. Dec. 21, 1998) (dismissing RICO, antitrust, consumer protection, fraud, special duty, indemnity, and unjust enrichment claims brought by self-insured employer)

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit